No. 90-366

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

STATE OF MONTANA,

     Plaintiff and Respondent,

-vs-

STEVEN RICHARD PALMER,

     Defendant and Appellant.

FILED

FEB 12 1991

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

     Larry Jent, Attorney at Law, Bozeman, Montana

     For Respondent:

     Hon. Marc Racicot, Attorney General, Helena, Montana
Deanne L. Sandholm, Assistant Attorney General,
Helena, Montana
Michael Salvagni, Gallatin County Attorney,
Bozeman, Montana
Gary Balaz, Deputy Gallatin County Attorney,
Bozeman, Montana

Submitted on Briefs: January 17, 1991

Decided: February 12, 1991

Filed:

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Steven R. Palmer appeals from an April 10, 1990, judgment of the District Court of the Eighteenth Judicial District, Gallatin County, finding him guilty of recklessly eluding a peace officer and operating a motor vehicle under the influence of alcohol. We affirm.

Appellant presents two issues:

1. Was the evidence sufficient to find Palmer guilty of recklessly eluding a police officer?

2. Was the evidence sufficient to find Palmer guilty of driving under the influence of alcohol?

I

This case involves a fourteen-mile high speed car chase by three police officers, reminiscent of a "Dukes of Hazzard" television episode. At approximately 2:30 a.m. on September 11, 1988, Officer David Reynolds of the Gallatin County Sheriff's Department observed a car traveling west on U.S. Highway 191, also known as Huffine Lane, near the Main Mall in Bozeman, Montana. A radar reading showed the car to be going 68 miles per hour in a 45 miles per hour speed zone. Reynolds, who was proceeding east, switched on his emergency lights as the car approached. The car went by him, and Reynolds, with his lights and siren on, turned around in order to pursue the speeding car. Reynolds could see that the car was a dark, full-sized, older, American-make car.

The car accelerated, temporarily lost control as it veered off

2

the right-hand side of the road, and continued westbound. Reynolds, traveling at speeds from 85 to 95 miles per hour, tried to overtake the car, yet the car continued to extend the distance between them. Rain mixed with snow was falling, and Reynolds found that if he attempted to increase his speed, his vehicle would hydroplane. Reynolds testified that the car ahead was reaching speeds in excess of 100 miles per hour.

Reynolds kept visual contact with the taillights of the speeding car until it swung north on Jackrabbit Lane. As soon as Reynolds turned north, he could see the taillights again. No other cars were on the highway at that point.

When he realized that the car was not going to stop, Reynolds contacted the county dispatcher. Reynolds again radioed the dispatcher when he turned right on Jackrabbit Lane. The county dispatch unit notified Belgrade police officer, John Woodland, that Reynolds was pursuing a northbound car on Jackrabbit Lane. Woodland headed south on Jackrabbit. As he met the pursued car, Woodland turned on his emergency lights. Reynolds lost sight of the taillights of the fleeing car because of the lights on Woodland's car and the lights from Bair's truck stop. Woodland reversed direction and also lost sight of the escaping car.

The county dispatcher had called the Montana Highway Patrol who contacted Patrolman Dan Smith in the Belgrade area. Smith was approximately one-half mile behind Woodland. When Smith saw the fleeing car go past Woodland, he turned around, switched on his siren and emergency lights, and headed north, watching the

3

approaching car in his rear view mirror. The driver of the speeding car flashed his lights, but did not slow down, and burst by Smith as Smith pulled over on the shoulder of the road.

The car sped north on Jackrabbit with Smith in pursuit. As he approached a truck, the driver of the escaping car started to pass, saw an oncoming car, skidded off the road to the left momentarily, swerved back across the road, and plummeted down a fifteen-foot embankment on the right side of the road. Smith stopped his patrol car, got out, and looked over the embankment. But instead of stopping, the driver revved the motor and headed northward in the ditch. The car came to a small irrigation ditch, jumped the irrigation ditch, turned eastward, and continued in the ditch parallel to Alaska Road South.

The driver of the car attempted to escape the ditch onto Alaska Road South, tore across the road through the interstate fence, and ended up on the eastbound on-ramp to Interstate 90 facing the wrong way. Smith, going west, followed on Alaska Road south, which runs parallel to the on-ramp to Interstate 90.

When the car reached the intersection of the eastbound on-ramp and Jackrabbit, it crossed Jackrabbit Lane, slid down another ten to fifteen foot embankment, ripped through the interstate fence, hit the side of Amsterdam Road, and again careened through the interstate fence into a ditch. The car continued westbound in the ditch for about two-tenths of a mile and then climbed onto Amsterdam Road.

The car accelerated to approximately 70 to 75 miles per hour,

but at a point where Amsterdam Road makes a large sweeping turn to the left, the car again flew off the road, hit a road sign, and bounced into a field. The car bolted through the field toward the interstate, but came to a fence. Following the fence, the car swerved back toward Amsterdam Road. As the car neared Amsterdam Road, it struck a private approach road, soared airborne for 58 feet, and came to a final stop on the far side of Amsterdam Road. Steam spewed from the radiator of the car, which looked as if it had been in a demolition derby.

Smith had the car in visual contact from the instant he first saw the car go by Woodland on Jackrabbit Lane until it crashed, except for the few moments he stepped from his car to peer over the first embankment the car dived down and for a few seconds when the car slid down the second embankment.

While Smith was tracking Palmer's car, Reynolds and Woodland pulled into Bair's truck stop and approached another vehicle which had a large amount of steam coming off the front end. When the steam cleared, Reynolds realized that it was not the same vehicle that he had been pursuing. Shortly thereafter, the officers received radio contact from Smith indicating that Palmer's car had wrecked.

After the crash, Smith approached the car and saw Palmer lying with his head on the floor under the dashboard and with his feet up on the steering wheel. Palmer was unconscious. When Woodland and Reynolds arrived at the scene, Reynolds recognized the car as the one which had passed him on Huffine Lane. Reynolds, an

emergency medical technician, applied a dressing to a large laceration on Palmer's neck. Palmer began to regain consciousness and appeared to be in shock, flailing around and fighting the assistance being given him.

At the hospital, Reynolds noticed the odor of alcohol on Palmer's breath. After reading the implied consent law to Palmer, he placed him under arrest and requested a blood test. Reynolds informed Palmer that if he refused the blood test he would lose his driver's license. Reynolds ordered the nurses to draw blood for the test, but Palmer refused. No blood sample was taken. Reynolds cited Palmer for speeding, driving under the influence of alcohol, recklessly eluding a police officer, and failing to have insurance.

On February 16, 1989, Palmer was convicted in justice court of speeding, driving under the influence of alcohol, and recklessly eluding a police officer. Palmer appealed to district court and after a bench trial was convicted of driving under the influence of alcohol and eluding a police officer. On May 10, 1990, the District Court sentenced Palmer to consecutive sentences of six months in jail and a total fine of $1,000. All but 45 days of the jail sentence and $500 of the fine were suspended.

II

The first issue is whether the evidence was sufficient to find Palmer guilty of recklessly eluding a police officer.

The standard of review in a criminal case where the issue is sufficiency of the evidence is whether the evidence, when viewed in a light most favorable to the prosecution, would allow any

6

rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Holman (1990), 241 Mont. 238, 241, 786 P.2d 667, 669; State v. Tome (1987), 228 Mont. 398, 400, 742 P.2d 479, 481. The weight of the evidence and the credibility of the witnesses are "exclusively the province of the trier of fact. If the evidence conflicts, it is within the province of the trier of fact to determine which shall prevail." State v. Oman (1985), 218 Mont. 260, 265, 707 P.2d 1117, 1120.

Pursuant to Montana law, a person commits the offense of recklessly eluding an officer when he:

> operates any vehicle in willful or wanton disregard for the safety of persons or property while fleeing or attempting to flee from or elude a peace officer who is lawfully in pursuit and whose vehicle is at the time in compliance with the requirements of 61-9-402.

Section 61-8-301(1)(b), MCA. The charge against Palmer was eluding a police officer from Huffine Lane to Jackrabbit Lane. Palmer contends that a reasonable doubt exists as to whether he was the driver of the car which Officer Reynolds pursued from Huffine Lane to Jackrabbit Lane before Reynolds lost sight of the car.

Palmer posits two arguments. First, because Officer Reynolds lost sight of the car he was pursuing on Jackrabbit Lane and mistakenly stopped another vehicle at Bair's truck stop, a reasonable doubt arises as to whether Palmer was the driver of the car that eluded Reynolds on Huffine and Jackrabbit.

Palmer's theory is rebutted by the evidence. Although Reynolds testified that he lost sight of the fleeing car near Bair's truck stop, at that moment Patrolman Smith of the Montana

7

Highway Patrol had sight of the car and kept the fleeing car in view until the end of the chase, with the exceptions of the few seconds when Palmer plunged out of sight over the fifteen-foot embankments. Smith, heading south on Jackrabbit Lane following Officer Woodland, saw the northbound car Reynolds was pursuing speed by Woodland's car without stopping. Smith then made a U-turn and could see the fleeing car approaching him in his rear-view mirror.

According to the testimony of Reynolds, he had Palmer's car in sight at all times except for a matter of seconds when Palmer turned north on Jackrabbit from Huffine Lane. No other vehicles were in the vicinity when Palmer turned north on Jackrabbit Lane.

In addition, Reynolds testified that Palmer's car was the same color and type as had passed him on Huffine Lane before he turned around and began giving chase. Reynolds also attested that as soon as he had a clear view of the stopped vehicle at Bair's truck stop, he realized that the vehicle was not the one he had been chasing.

Secondly, Palmer claims that, given the times reported in the dispatch log of the beginning of the chase and the occurrence of the accident and given the distances traveled, it was impossible for Palmer to have been the driver of the car spotted on Huffine Lane. Palmer asserts that a vehicle would have to travel at speeds approaching 160 miles per hour in order to cover the distance between the Main Mall in Bozeman and the place of the wreck on Amsterdam Road.

Reynolds called the dispatcher at 2:37 a.m. to report that he

8

was in pursuit of Palmer's car. The accident at Amsterdam Road was reported at 2:44 a.m. Smith estimated that the car would have had to travel an average speed of 94 miles per hour to cover the distance between the two points.

The discrepancy between the speeds estimated by Smith and Palmer is due to the location of Reynolds' vehicle when he reported to the dispatcher. Palmer placed him at the Main Mall, but Reynolds testified that he didn't call the dispatcher until he realized that the speeding car was not going to stop. Thus, the distance was shorter than envisioned by Palmer.

The District Court addressed this issue in its findings:

> On January 4, 1990, Defendant asked for a continuance of this trial for the reason that he had retained a physicist to confirm by expert opinion that based on times, distance and speed that it could not have been Defendant who Officer Reynolds pursued down Huffine and Jackrabbit Lanes. Based on that representation, the cause was continued. The expert did not appear at this trial. Thus, the Court has only counsel's argument and clever though it may be, it is not evidence.

The District Court relied on the credible evidence of the officers' testimony in concluding that Palmer's car was the same car initially pursued by Reynolds on Huffine Lane. Viewing the evidence in the light most favorable to the prosecution, we hold that the District Court, as the trier of fact, relied on sufficient evidence to find Palmer guilty beyond a reasonable doubt of recklessly eluding a police officer.

## III

The second issue is whether the evidence was sufficient to

find Palmer guilty of driving under the influence of alcohol.

Palmer argues that the only proof of intoxication was that at the hospital Officer Reynolds smelled alcohol on Palmer's breath; therefore, the evidence was insufficient to find Palmer guilty beyond a reasonable doubt of driving under the influence of alcohol. Palmer asserts that no other evidence, such as a field sobriety test, slurred speech, bloodshot eyes, or results of the horizontal gaze nystagmus test, was presented.

The District Court based its verdict on the following finding:

> The admitted physical facts of the Defendant's impaired driving judgment is almost sufficient in and of itself to sustain the charge. The odor of alcohol detected on the operator's breath by an experienced officer, after having personally observed the irregular, erratic manner in which the vehicle was operated, is sufficient.

The manner in which a vehicle is driven can be evidence of driving under the influence of alcohol. See State v. Peterson (1989), 236 Mont. 247, 250, 769 P.2d 1221, 1223. Here, the way in which the car was driven would not be expected to be undertaken by a sober individual unless he were a stuntman in a car chase movie. Driving at speeds over 100 miles per hour under wet road conditions, swerving off the road, plunging over two embankments, driving down ditches and across fields, smashing through the interstate fence, and failing to stop even though signaled to stop by three police officers demonstrate a manner of driving that suggests the driver was intoxicated.

Since Palmer was unconscious immediately after the crash and just beginning to regain consciousness as he was moved into the

10

ambulance, field tests would have been inappropriate. At the hospital, Palmer seemed confused when Reynolds sought to explain the implied consent law and obtain his permission for a blood test. However, he was sufficiently aware to answer questions asked him by medical personnel and to refuse the alcohol blood test when ordered.

Further, the trier of fact can consider as evidence of guilt refusal to submit to a blood test or other tests of intoxication as provided by law. Section 61-8-404(2), MCA; State v. Jackson (1983), 206 Mont. 338, 347, 672 P.2d 255, 259.

We hold that sufficient evidence was presented for the District Court to conclude that Palmer was guilty beyond a reasonable doubt of driving under the influence of alcohol. The judgment of the District Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

11