No.  92-361

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

STATE OF MONTANA,

       Plaintiff and Respondent,

  -vs-

BRUCE A. FLACK,

       Defendant and Appellant.

APPEAL FROM:   District Court of the Sixth Judicial District,
               In and for the County of Park,
               The Honorable Byron L. Robb, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

           Bruce E. Becker, Attorney at Law, Livingston,
           Montana

       For Respondent:

           Hon. Marc Racicot, Attorney General; Barbara C.
           Harris, Assistant Attorney General, Helena, Montana
           Wm. Nels Swandal, Park County Attorney, Livingston,
           Montana

FILED

Filed: AUG 27 1993

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:  January 21, 1993

Decided:  August 27, 1993

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Bruce Flack appeals from an order of the Sixth Judicial District Court, Park County, denying his motion to suppress statements made on January 5 and January 8, 1992. We affirm in part and reverse in part.

On January 5, 1992, Bruce Flack (Flack) and Alan Gustafson (Gustafson) were taken to the Park County Sheriff's office as suspects in a robbery. The two were suspected of breaking into the Bill Eyman residence near Livingston, Montana, and stealing approximately $265 in cash, credit cards, blank checks, and several firearms.

Flack was detained at the sheriff's office while Gustafson was interrogated. After waiting approximately four hours, Flack was taken into an interrogation room, where Charles Johnson (Johnson), Park County Sheriff, and Lynn Gillett (Gillett), Captain of the Livingston City Police, were present. Before the interrogation, Flack was advised of, and waived, his Miranda rights. During the taped interrogation, Flack denied any knowledge of the robbery. After fifty-five minutes of questioning, Johnson arrested Flack for the robbery pursuant to a valid arrest warrant. At that time, Flack stated, "I guess I'm going to have to get me a lawyer. You guys are going to have to prove it."

With that remark, the interrogation formally concluded and the tape recorder was turned off. Johnson left the room. Gillett continued to talk with Flack for five to ten minutes, detailing the information already obtained by the prosecution relating to the

2

robbery. In response, Flack indicated that he had been at the Eyman residence at the time of the robbery but stated that he had remained on the road. Flack refused to have the statement recorded.

On January 6, Flack was brought before a justice of the peace for his initial appearance. The justice of the peace informed Flack of the charge and advised him of his rights, including the right to be represented by an attorney. Bail was set. Flack was given, and completed, a form requesting court-appointed counsel. Public Defender Dan Yardley spoke with Flack on January 7, but determined that his representation of the youth might create a conflict in representing Flack. Different counsel was appointed to represent Flack on January 15.

Flack remained in jail because he was unable to make bail. During the morning of January 8, Flack was again questioned by Gillett. The parties dispute who initiated the interrogation. Gillett did not readvise Flack of his Miranda rights at the beginning of the interrogation. Instead, Gillett asked if Flack remembered the Miranda warning previously read to him; Flack responded affirmatively. Gillett then asked if Flack was willing to waive his rights and answer questions; again Flack responded "Yes." During the twenty-five minute interrogation, Flack confessed his involvement in the robbery.

On February 19, Flack moved to suppress the January 5 and January 8 statements. Flack asserted that his constitutional rights were violated on January 5 when the State resumed the

interrogation after he requested legal representation, and on January 8 when he was interrogated again without legal counsel. Furthermore, Flack asserts that he was not properly advised of his Miranda rights at the January 8 interrogation and, on that basis, that he did not knowingly, intelligently and voluntarily waive his right against self-incrimination. After a suppression hearing, the District Court entered its findings of fact, conclusions of law and order denying the motion to suppress the statements.

The Park County Attorney and Flack filed a "Stipulation of Facts" on March 25. The stipulation listed the facts that the prosecution could establish if a trial was held. The stipulation indicated the Flack would neither resist the State's case nor plead guilty to the robbery charge. Flack expressly reserved his right to appeal the order denying his motion to suppress.

Based on the agreed statement of facts, the District Court found Flack guilty of robbery. The court sentenced Flack to a term of eight years at the Montana State Prison, with five years suspended. Flack appeals the denial of his motion to suppress the January 5 and January 8 statements.

Did the District Court err in denying the motion to suppress Flack's January 5 statement?

At the suppression hearing, the State maintained that the January 5 statement was not a result of continued interrogation by Gillett. Gillett testified as follows:

Q. Now, what happened after the interview was over?

A. Sheriff Johnson left the room, to get the work started because he had placed Mr. Flack under arrest, and

4

I was just generally talking with Mr. Flack and advised him that we knew what went on.

Q. Did you ask him any questions after the interview?

A. No, I just advised him.

Q. And do you recall what you told him at that time?

A. No, I don't.

Q. What, if anything, did the Defendant say?

A. He voluntarily said that he was there, but he only stood on the road.

. . .

Q. Did you ask him a question to elicit that response?

A. No.

Flack testified that he believed he made the statement while under further interrogation:

Q. What happened after they turned off the tape recorder?

A. Gillett proceeded to talk to me.

Q. Was Charlie Johnson there?

A. No, he left the room at that point.

Q. What did he talk to you about?

A. Saying that I might as well just go ahead and hang it up because they got me, and that I couldn't get out of it, or whatever.

Q. Did you feel like you were being interrogated further?

A. Yes, I did.

Q. And this all happened after you said, I guess I should get an attorney?

A. Yes.

On the basis of the testimony presented at the suppression

5

hearing, the District Court concluded that "any incriminating statement or admission made by Bruce Flack on January 5, 1992, was made spontaneously by him, and was not elicited by questions from law enforcement personnel." On that basis, the District Court denied the motion to suppress the statement.

Our standard for reviewing a district court's conclusion of law is whether the court's interpretation of the law is correct. Steer, Inc. v. Dept. of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603. To determine whether the District Court correctly concluded that the January 5 statement was not elicited by Gillett and, therefore, was not obtained in violation of Flack's constitutional rights, we examine whether the comments made by Gillett after Flack invoked the right to counsel constituted an interrogation.

The United States Supreme Court addressed the meaning of interrogation in the context of an accused's right to counsel in Rhode Island v. Innis (1980), 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297. There, the defendant asked to speak with an attorney after he was arrested for the homicide of a taxi driver and advised of his Miranda rights. While transporting the defendant to the police station, an officer expressed concern to another officer that handicapped children, who frequented the area where the arrest occurred, might find the missing murder weapon. The defendant overheard the conversation and requested that they return to the scene of the arrest where he would locate the weapon.

The United States Supreme Court addressed whether the

6

officers' conversation relating to handicapped children was tantamount to interrogation in the context of Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The Court indicated that language in Miranda suggested that the Miranda rules applied only to interrogation that involved express questioning of a defendant held in custody. The police practices that invoked the concerns addressed in Miranda, however, included techniques of persuasion in addition to express questioning. On that basis, the Court concluded that the Miranda safeguards were not limited to situations in which a defendant in custody was subjected to express questioning. Innis, 446 U.S. at 300-301.

The Court determined in Innis that interrogation under Miranda includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 300-301. Furthermore, the Court stated that in order to determine whether an incriminating response was reasonably likely to be elicited from the suspect, the primary focus should be on the perceptions of the suspect rather than on the intent of the police. Innis, 446 U.S. at 301.

Applying these principles to the facts before it in Innis, the Court concluded that the officers could not reasonably foresee that their conversation, which the Court characterized as a few offhand remarks, was likely to elicit an incriminating response from the defendant. On that basis, the Court determined that the defendant

7

had not been subjected to further interrogation after he invoked his right to counsel. Innis, 446 U.S. at 303.

In the case before us, the District Court concluded that the January 5 statement was made spontaneously by Flack and was not elicited by questions from law enforcement personnel. Based on Innis, it is clear that the District Court erred in limiting its inquiry to whether the January 5 statement was elicited by direct interrogation.

We determine that Gillett's comments constituted a practice that law enforcement should know is reasonably likely to evoke an incriminating response from a suspect; therefore, those comments constitute interrogation. Unlike the officer's statement in Innis, Gillett's comments cannot be characterized as a few overheard, off-hand remarks. According to Gillett's own testimony, his comments lasted five to ten minutes and were directed at Flack. Furthermore, Gillett testified that his comments informed Flack of the information in the prosecution's possession relating to the robbery. Under these facts, Gillett should have reasonably foreseen that his comments would evoke a response from Flack.

Our determination that Gillett's comments constituted interrogation is further supported by considering them from Flack's perspective. Gillett's comments immediately followed a fifty-five minute interrogation and were made while Flack remained in the interrogation room. As a result, there was no break between the preceding direct questions and Gillett's comments that would have dissipated the air of interrogation. Indeed, Flack testified that

he felt he was subjected to further interrogation following his request to speak to an attorney. Furthermore, Flack's testimony indicates his perception that Gillett's comments presumed his guilt and suggested that he concede an inevitable conviction:

Q. What did he talk to you about?

A. Saying that I might as well just go ahead and hang it up because they got me, and that I couldn't get out of it whatsoever.

Under these circumstances, Flack's January 5 statement can properly be considered a response to interrogation.

We conclude that the District Court erred in concluding that the January 5 statement was not elicited by Gillett. Furthermore, based on our determination that the statement was a product of interrogation after Flack asserted his right to counsel, we conclude that the District Court's denial of Flack's motion to suppress violated Flack's constitutional right to the assistance of counsel under Miranda, 384 U.S. at 474. We hold that the District Court erred in denying Flack's motion to suppress the January 5 statement.

Did the District Court err in denying the motion to suppress Flack's January 8 statement?

At the suppression hearing, the State maintained that Flack had initiated the January 8 interview with Gillett, that he waived his Miranda rights and that Flack's statement was given freely and voluntarily. Gillett testified that he was notified by a jailer that Flack wanted to talk to him. Detention officer Dennis McBride testified that on the morning of January 8, Flack asked to talk to

9

Gillett, that he passed the request along to Gillett and that he subsequently took Flack upstairs for the meeting with Gillett. According to the transcript, the January 8 interview began as follows:

> Q: Bruce I will advise you that I have a recorder running here, is that alright with you?
>
> A: Yes.
>
> Q: You remember the other day you were read your miranda [sic] rights, do you remember those?
>
> A: Yes I do.
>
> Q: And at this time are you still able, willing to waive your rights and answer questions?
>
> A: Yes.

Flack, on the other hand, testified that on the morning of January 8, the jailer came to his cell and told him that he had a visitor; he was taken to a room where Gillett was waiting with a tape recorder. Flack denied having asked to see Gillett and testified that he did not intend to give up his constitutional rights.

The District Court found the testimony of the law enforcement witnesses more credible than Flack's with regard to who had initiated the January 8 interview. It also found, on the basis of the officers' testimony and the interview transcript, that Flack was aware of his rights, knowingly and intelligently waived those rights, and voluntarily confessed to the robbery. As a result, the court concluded that the State had established by clear and convincing evidence that Flack's confession was made voluntarily.

Our standard in reviewing a district court's findings of fact

10

is whether the findings are clearly erroneous. Rule 52(a), M.R.Civ.P; Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 470, 474, 803 P.2d 601, 603. The first prong of the clearly erroneous standard is whether the finding is supported by substantial evidence. Interstate Prod. Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287.

Here, there is no question that the court's findings are supported by substantial evidence consisting of the officers' testimony and the January 8 interview transcript. Flack asserts-- as though it were a matter of fact--that law enforcement initiated the January 8 meeting; the District Court found otherwise, however, based on substantial evidence of record. It is elementary that the direct evidence of one witness who is entitled to full credit is sufficient proof of any fact. Smith v. Fladstol (1991), 248 Mont. 18, 20, 807 P.2d 1361, 1363; § 26-1-301, MCA. Here, the court relied on testimony from two law enforcement officers. Similarly, Flack asserts that the record of the January 8 interview is devoid of any determination as to his waiver of rights; again, the court found otherwise based on the record evidence set forth above.

The crux of the District Court's findings is its determination that the testimony of the law enforcement officers was more credible than Flack's. A trial court acting as a finder of fact is in the best position to observe the witnesses, including their demeanor and credibility. Nave v. State Comp. Mut. Ins. Fund (1992), 254 Mont. 54, 58, 835 P.2d 706, 709. The weight of the evidence and the credibility of the witnesses are exclusively the

11

province of the trier of fact and, in the event of conflicting evidence, it is within the province of the trier of fact to determine which will prevail. State v. Palmer (1991), 247 Mont. 210, 214, 805 P.2d 580, 582. Here, the District Court determined the credibility of the witnesses before it and entered findings based on substantial evidence. We conclude that the findings are not clearly erroneous.

Nor is the court's conclusion that Flack waived his rights and made his confession voluntarily erroneous. The conclusion is based on the court's determinations that Flack initiated the January 8 interview and that he waived his rights at the beginning of that interview. As such, Flack's legal argument in this regard, relying on Edwards v. Arizona (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, is misplaced.

In Edwards, the United States Supreme Court specifically stated that an accused, having expressed a desire for counsel, is not subject to further interrogation until counsel has been made available to him, "unless the accused himself initiates further communication, exchanges or conversations with the police." Edwards, 451 U.S. at 484-85 (emphasis added). As discussed above in addressing the first issue in this case, Flack expressed a desire for counsel on January 5 and further interrogation at that time violated his constitutional rights. The District Court determined that, subsequent to that time, Flack initiated a further interview with law enforcement. This is precisely the situation contemplated by the Edwards exception to the "no further

12

interrogation" rule.

The District Court's findings are not clearly erroneous. Its related conclusions are not erroneous as a matter of law. As a result, we hold that the District Court did not err in denying the motion to suppress Flack's January 8 statement.

Affirmed in part and reversed in part.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

13

Justice Terry N. Trieweiler specially concurring.

I concur with the majority's conclusion that the statement made by Bruce Flack on January 5 should be suppressed. I also agree with the reasons given for that conclusion.

I concur with the majority's conclusion that there was substantial evidence to support the District Court's finding that Flack waived his Fifth Amendment rights prior to the statement given to authorities on January 8, 1992.

By concurring in the majority opinion, I do not mean to conclude that the defendant's situation does not present serious concerns about his Sixth Amendment right to counsel. Flack was arrested on January 5. He made his initial appearance and requested court-appointed counsel on January 6. However, he received no effective advice until January 15, ten days after his arrest. By the time he waived his right to remain silent, he was beginning his fourth day in jail without any meaningful advice from counsel.

I concur in the result of the majority opinion because the delay in appointment of counsel is not the basis of Flack's appeal. That issue has not been briefed and is not before the Court.

_____
Justice

14

August 27, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


Bruce E. Becker
Attorney at Law
P.O. Box 1113, 116 W. Callender
Livingston, MT 59047

Hon. Joseph P. Mazurek, Attorney General
Barbara C. Harris, Assistant Atty. General
215 N. Sanders, Justice Bldg.
Helena, MT 59620

Wm. Nels Swandal
Park County Attorney
414 E. Callendar St.
Livingston, MT 59047


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
      Deputy