No. 96-054

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996


STATE OF MONTANA,

     Plaintiff and Respondent,

  v.

JOSEPH BROKEN ROPE, JR.,

     Defendant and Appellant.

FILED

OCT 18 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA


APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Russell C. Fagg, Judge presiding.


COUNSEL OF RECORD:

    For Appellant:

        John I. Petak, III, Deputy Yellowstone County Public
        Defender, Billings, Montana

    For Respondent:

        Hon. Joseph P. Mazurek, Attorney General,
        Carol Schmidt, Ass't Attorney General,
        Helena, Montana

        Dennis Paxinos, Yellowstone County Attorney,
        Daniel L. Schwarz, Deputy Yellowstone County
        Attorney, Billings, Montana


Submitted on Briefs: August 15, 1996

Decided: October 18, 1996

Filed:

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Joseph Broken Rope, Jr. (Broken Rope) appeals from the judgment entered by the Thirteenth Judicial District Court, Yellowstone County, on his guilty pleas to charges of carrying a concealed weapon, criminal possession of dangerous drugs and criminal possession of drug paraphernalia, having reserved the right to appeal the court's denial of his motion to suppress. We reverse and remand.

The dispositive issue on appeal is whether the District Court erred in finding that a particularized suspicion existed to justify an investigative stop of Broken Rope under § 46-5-401, MCA.

The following facts are undisputed. On March 21, 1995, at approximately 1:00 a.m., Deputy Kevin Evans (Evans) of the Yellowstone County Sheriff's office was on patrol near the Lockwood Kwik Way convenience store in Billings, Montana. He observed a vehicle occupied by two individuals, later identified as Elton Belgarde (Belgarde) and Broken Rope, traveling west on Highway 87 East. Evans ran the vehicle's license number through a records check which revealed that the vehicle was registered to Belgarde and that a warrant had been issued for his arrest for fish and game violations.

When Belgarde and Broken Rope arrived at the Kwik Way, they left the vehicle and went inside the store. Evans watched the two men from his patrol car, planning to wait until they were back in their vehicle before approaching them. Belgarde and Broken Rope exited the store after a short time. When they noticed Evans, they

2

began using the telephone, moving around in the store's parking lot, and staring at Evans. Evans decided that Belgarde and Broken Rope were not going to get back into Belgarde's vehicle while he was present, so he radioed his backup, Deputy M. J. Mullikin (Mullikin), for assistance.

When Belgarde and Broken Rope saw Evans and Mullikin drive into the immediate area, they began putting their hands into their pockets. The deputies told them to keep their hands out of their pockets and, when Broken Rope attempted a second time to put his hands into his pockets, the deputies told him again to keep his hands out of his pockets. Evans then arrested Belgarde on the outstanding fish and game warrant.

Mullikin frisked Broken Rope and asked him if he had any weapons, knives or needles on his person. Broken Rope said that he had a knife in his belt. In addition to the knife, Mullikin found a .38 caliber Smith & Wesson handgun in Broken Rope's waistband under his shirt. When asked about additional weapons or drugs, Broken Rope said that he had some marijuana in his pants pocket. Mullikin searched Broken Rope a second time and felt a hard object in Broken Rope's pants pocket which Broken Rope identified as a marijuana pipe. Evans also searched Broken Rope and, in addition to the marijuana pipe containing suspected marijuana residue, he found a black canister containing a white powdery substance in Broken Rope's other pants pocket. Broken Rope was taken to the Yellowstone County detention facility and booked. Evans then removed the back seat of his patrol car and found a baggie

3

containing a rock-like substance under where Broken Rope had been sitting.

The State of Montana (State) charged Broken Rope by information with the felony offenses of carrying a concealed weapon and criminal possession of dangerous drugs, and the misdemeanor offense of criminal possession of drug paraphernalia. After pleading not guilty, Broken Rope moved to suppress the evidence seized by the deputies. The parties agreed that the District Court could decide the issue without a hearing, and the court subsequently denied Broken Rope's motion.

Broken Rope later pled guilty to the charged offenses, reserving the right to appeal the court's denial of his motion to suppress. The District Court entered judgment and sentence and Broken Rope appealed. The court and the parties filed an "Agreed Statement of Facts for Record on Appeal" pursuant to Rule 9(e), M.R.App.P.

> Did the District Court err in finding that a particularized suspicion existed to justify an investigative stop of Broken Rope under § 46-5-401, MCA?

In denying Broken Rope's motion to suppress, the District Court found that Evans had a particularized suspicion, based on his training and experience as a peace officer and Broken Rope's actions, that Broken Rope had been or was engaged in criminal activity. On that basis, the District Court concluded that the investigative stop and search of Broken Rope was justified and denied the motion to suppress.

4

Broken Rope contends that the District Court's finding regarding Evans' particularized suspicion to justify the investigative stop pursuant to § 46-5-401, MCA, is clearly erroneous and, therefore, that the court erred as a matter of law in applying the statute and denying his motion to suppress. We review such findings of fact by a district court to determine whether they are clearly erroneous; we review a district court's conclusions of law to determine whether they are correct. See Bauer v. State (1996), 275 Mont. 119, 122, 910 P.2d 886, 888; State v. Williams (1995), 273 Mont. 459, 462, 904 P.2d 1019, 1021 (citing State v. Flack (1993), 260 Mont. 181, 188, 860 P.2d 89, 94).

When a law enforcement officer seizes a person, such as in an investigative stop, the right against unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution applies. Bauer, 910 P.2d at 889. As a result, the Montana legislature amended Montana's investigative stop statute in 1991 to conform with both United States Supreme Court and Montana Supreme Court case law on that subject. State v. Reynolds (1995), 272 Mont. 46, 49, 899 P.2d 540, 542. Section 46-5-401, MCA, provides:

> **Investigative stop.** In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

(Emphasis added.)

5

In light of the requirement that some objective manifestation must exist to support a particularized suspicion that a person is engaged in criminal activity before a stop can be made, we have adopted a two-part test to determine whether an officer had sufficient cause to stop a person. Anderson v. State Dept. of Justice (1996), 275 Mont. 259, 263, 912 P.2d 212, 214 (citing State v. Gopher (1981), 193 Mont. 189, 631 P.2d 293). First, the State must establish objective data from which an experienced officer can make certain inferences. Second, the State must show a resulting suspicion that the person is, or has been, engaged in wrongdoing or was a witness to criminal activity. Anderson, 912 P.2d at 214. Whether a particularized suspicion exists is a question of fact which is dependent on the totality of the circumstances. Anderson, 912 P.2d at 214 (citing Reynolds, 899 P.2d at 542-43).

The initial, and primary, thrust of the analysis is whether objective data existed from which an experienced officer could conclude that the person stopped is, or has been, engaged in criminal activity. In Bauer, for example, the deputy observed Bauer driving well over the speed limit, crossing the center line more than once and braking hard around curves. Bauer, 910 P.2d at 887, 890. We concluded that, under the totality of the circumstances, the evidence supported the deputy's particularized suspicion that Bauer had committed an offense. Bauer, 910 P.2d at 890.

Similarly, in Anderson, the officer testified that she saw Anderson shuffle and stumble toward his car between 1:00 a.m. and

6

2:00 a.m. and fail to use his vehicle's turn signals at every turn for several blocks; in addition, he did not stop when she asked him to. Anderson, 912 P.2d at 213. The officer also testified that, even from ten to fifteen feet away, she could smell a very strong odor of intoxicants emanating from Anderson. Anderson, 912 P.2d at 213. Those facts were sufficient, under the totality of the circumstances, to support the officer's particularized suspicion that Anderson had committed the offense of driving under the influence of alcohol. Anderson, 912 P.2d at 215.

In other cases, however, this Court has held, under the totality of the circumstances, that the evidence did not support a particularized suspicion that the person stopped had committed, or was committing, an offense. In Reynolds, the deputy sheriff testified that he observed a pickup moving through an intersection "bordering on traveling too fast" for the conditions and hesitating seven to ten seconds at the intersection where the deputy was waiting, but that the driver had not necessarily violated the law. Reynolds, 899 P.2d at 542-43. Other than those observations, the deputy did not see any violations of the law and Reynolds did not exhibit behavior consistent with a person driving while under the influence of alcohol. Reynolds, 899 P.2d at 543. We concluded that, under the totality of the circumstances, a possible traffic violation--in the absence of any other objective evidence of criminal activity--did not support a particularized suspicion that Reynolds had been engaged in wrongdoing. Reynolds, 899 P.2d at

7

543. On that basis, we held that the investigative stop was not justified under § 46-5-401, MCA. Reynolds, 899 P.2d at 543.

In the present case, the objective data Evans observed was Broken Rope entering and leaving the Kwik Way at approximately 1:00 a.m., using the telephone, moving around in the Kwik Way parking lot, putting his hands in his pockets, and staring at Evans. These actions do not support a particularized suspicion that Broken Rope was, or had been, engaged in criminal activity.

The State contends that Evans and Mullikin also relied on the existence of an outstanding warrant for "one of the men" as objective data supporting their investigative stop and search of Broken Rope. However, the undisputed fact is that the warrant for fish and game violations was for Belgarde, not for Broken Rope. The State cites to no authority under which a person merely being in the company of someone for whom an arrest warrant has been issued is sufficient--on either a stand-alone basis or in conjunction with objective data of the type that existed in this case--to create a particularized suspicion that that person had committed, or was committing, an offense so as to justify an investigative stop.

The State also contends that the deputies could draw upon their training and experience as peace officers to conclude that Belgarde and Broken Rope were acting in a suspicious and nervous manner, thereby justifying an investigative stop. At the outset, we observe that the agreed facts before us contain no information about the deputies' training and experience or how such training

8

and experience could lead them to conclude that Belgarde and Broken Rope's activities were "suspicious" and "nervous." Indeed, no agreed fact states that the deputies reached such a conclusion.

Moreover, there is nothing inherently suspicious about Broken Rope using a pay telephone, moving around in a convenience store parking lot, putting his hands in his pockets or staring at a sheriff's deputy. As to whether these activities were "nervous," many law-abiding citizens may well be nervous when their activities are being watched by law enforcement officers. On this record, Broken Rope's actions did not form the basis for inferences resulting in a particularized suspicion that Broken Rope was, or had been, engaged in criminal activity.

We conclude that, under the totality of the circumstances, the record is insufficient to support the District Court's finding that Evans had a particularized suspicion that Broken Rope was engaged in criminal activity; therefore, the court's finding is clearly erroneous. On that basis, we further conclude that the District Court erred in determining that the investigative stop of Broken Rope was justified pursuant to § 46-5-401, MCA.

The remainder of the State's arguments relate to the officers' entitlement to "frisk" a person and seize certain objects pursuant to § 46-5-402, MCA. According to the State, however, § 46-5-402, MCA, applies "[o]nce a peace officer has lawfully stopped a person under § 46-5-401 . . . ." Based on our conclusions that no particularized suspicion existed and that the investigative stop of

9

Broken Rope was not justified under § 46-5-401, MCA, we need not address the remainder of the State's arguments.

We hold that the District Court erred in denying Broken Rope's motion to suppress.

Reversed and remanded for further proceedings consistent with this opinion.

_____
                Justice

We concur:

_____
                Chief Justice

_____

_____
                Justices

10

Chief Justice J. A. Turnage, dissenting:

I respectfully dissent.

The District Court found that Deputy Sheriff Kevin Evans had particularized suspicion for a reasonable investigative stop of the defendant and subsequent search for weapons as reasonable police procedure for officer protection. This finding and the order denying suppression of the criminal contraband found on the person of defendant is supported by the record in this case.

The majority's review of the objective data in this case is notable for its brevity. Now the rest of the story.

At approximately 1:00 a.m. on March 21, 1995, Deputy Evans was patrolling a rural area of Yellowstone County near the Lockwood Kwik Way convenience store when he observed a vehicle with two occupants traveling west on Highway 87. After running a license plate record check, the deputy was notified that the vehicle was registered to Elton Belgarde and that a warrant for Belgarde's arrest was outstanding.

The Belgarde vehicle stopped at the Kwik Way convenience store, and the two occupants entered the store. The two individuals, one of whom was Elton Belgarde and the other the defendant herein, Joseph Broken Rope, exited the store, noticed Deputy Evans' car, began using the telephone and stared at the deputy. Deputy Evans called for Deputy Sheriff Mullikin to assist him.

Upon seeing the deputies pull into the immediate area, Belgarde and Broken Rope began putting their hands into their pockets. The officers told them to take their hands out of their

11

pockets. Defendant Broken Rope again reached to put his hands into his pockets and was told not to do so.

Deputy Evans placed Belgarde under arrest on the outstanding warrant. Deputy Mullikin, in preparing to frisk defendant Broken Rope, asked him if he had any weapons. Broken Rope told the deputy he had a knife on the back of his belt concealed under his shirt. Deputy Mullikin proceeded with a frisk of the defendant and in addition to the concealed knife found, also concealed in his waistband under his shirt, a five-round, fully loaded Smith & Wesson revolver. In addition, he found on defendant's person certain contraband drugs and a marijuana pipe.

Notwithstanding the unjustified reversal of the District Court's denial of a motion to suppress based on a claim of unconstitutional search and statutory violation, the rational and reasonable officer's protection procedure in finding the concealed .38 may not only have saved the deputies from harm, but may have prevented one more dead convenience store clerk.

The District Court carefully and correctly articulated its reasoning in holding that the stop and search of the defendant complied with applicable constitutional, statutory and case law. The District Court's order states in relevant part:

> Regarding the Defendant, upon his exiting of the Kwik Way store, the Deputy believed that he and Mr. Belgarde were acting in a nervous and suspicious manner. The two men were closely watching the Deputy. They walked around the parking lot, made some telephone calls, and evidenced an intention not to return to their automobile. In addition, because the Deputy knew about the warrant for Mr. Belgarde, their nervous actions were all the more suspicious.

12

As a result, the Deputy stopped, frisked and arrested Mr. Belgarde on the warrant. In addition, pursuant to State v. Gopher and sections 46-5-401 and 46-5-402, MCA, the Defendant was stopped and frisked. The stopping and frisking of the Defendant was proper because the Deputy had "particularized suspicion" that the Defendant had been engaged in wrongdoing. See Gopher, 631 P.2d at 296. The "particularized suspicion" was based on the previously mentioned suspicious actions of the Defendant and Mr. Belgarde upon leaving the Kwik Way store. In addition, it was appropriate to pat down the Defendant for safety purposes in order to secure the situation for the arrest of Mr. Belgarde based on the warrant. Section 46-5-402(1), MCA.

Additionally, it was appropriate for the Deputy to ask the Defendant if he possessed any weapons, knives or needles prior to the pat down for officer safety purposes. Id.

The Defendant admitted possessing a concealed knife on the back of his belt under his shirt. (Defendant's brief in support of motion to suppress, p. 2, line 16 & 17) However, the Deputy found not only a concealed knife, but also a fully loaded .38 caliber handgun hidden in the waistband of the Defendant's belt under his shirt. (Id. at line 18 & 19) Based on these discoveries, three conclusions are inescapable.

First, upon uncovering the concealed weapons, the Deputy had probable cause to arrest the Defendant for carrying concealed weapons. As the Court in State v. Sharp, 217 Mont. 40, 702 P.2d 959 (1985) stated, "A founded suspicion to stop for investigative detention may ripen into probable cause to arrest through the occurrence of facts or incidents after the stop." Sharp, 217 Mont. at 46.

Second, the discovery of the concealed weapons verified the Deputy's reasonable belief that a pat down was reasonably necessary for officer protection. And third, the discovery of concealed weapons demonstrated the necessity to search further. The Defendant had stated that he was carrying a knife, but made no mention of the handgun. As a result, the Defendant's comments as to the contents in his front pants pockets, i.e., marijuana and a marijuana pipe, did not render the subsequent officer safety search unreasonable. On the contrary, it was entirely reasonable to believe the Defendant possessed other weapons even though the Deputy specifically asked him if he had any drugs.

13

Therefore, because the Deputy had particularized suspicion that an offense had been, was being, or was about to be committed, based on the actions of the Defendant and the training and experience of the Deputy, a reasonable investigative stop and search of the Defendant was appropriate. An arrest of Mr. Belgarde was appropriate based on the issued warrant for his arrest. After stopping the Defendant and frisking him for officer protection, concealed weapons were found. Further officer protection search, demonstrated to be reasonable based on the previously uncovered weapons, resulted in discovery of controlled substance possession by the Defendant. The Court believes that all the uncovered evidence can properly be used against the Defendant in a criminal trial. As a result, the Court is persuaded that the Defendant's constitutional rights against unreasonable search and seizure have not been violated.

I agree with the District Court and therefor dissent.

Chief Justice

14

October 18, 1996

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

John I. Petak, III
Yellowstone County Public Defenders
2708 1st Ave. N., Ste. 400
Billings, MT 59101

Hon. Joseph P. Mazurek, A.G.
Carol Schmidt, Assistant
Justice Building
Helena, MT 59620

Dan Swartz, Deputy County Attorney
Yellowstone County
P.O. Box 35025, Courthouse (701)
Billings, MT 59107

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _N. Gallagher_
Deputy