No. 99-104

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 270

STATE OF MONTANA,

Plaintiff/ Respondent,

v.

DOUG TURNER,

Defendant/ Appellant.

APPEAL FROM: District Court of the Third Judicial District,

In and for the County of Powell,

The Honorable Ted Mizner, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

William F. Hooks, Appellate Defender Office, Helena, Montana

For Respondent:

Joseph P. Mazurek, Montana Attorney General, Jennifer Anders, Assistant Attorney General, Helena, Montana; Gerald Navratil, Dawson County Attorney, Glendive, Montana

Submitted on Briefs: March 16, 2000
Decided: October 26, 2000

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶1 In April 1988, Doug Turner (Turner) pled guilty to three counts of deliberate homicide, two counts of felony assault, and one count of aggravated burglary. He was sentenced to three consecutive life sentences in prison. In May 1993, Turner filed a postconviction relief petition seeking to withdraw his guilty pleas because they were involuntarily given based on alleged ineffective assistance of counsel. The Third Judicial District Court Judge, Ted Mizner, denied Turner's postconviction relief petition. We affirm.

¶2 The issues on appeal can be restated as follows:

> Should Turner be allowed to withdraw his guilty pleas because they were involuntary based on his claim of ineffective assistance of counsel?

## FACTUAL BACKGROUND

¶3 On November 19, 1987, Turner shot three people dead. Turner was drinking Southern Comfort, vodka, and beer at a party in Glendive, Montana. Turner was 16 years old and had just been released from an alcohol treatment program which he was committed to as a result of several juvenile offenses. After the party broke up, Turner was dropped off at his house around midnight. He went into his house and retrieved his .30-.30 rifle. Turner went next door and killed James Brooks, Ora Brooks, and Sharon Brooks. Turner had never met his neighbors before.

1. ¶Around midnight, a neighbor heard someone yell, "God damn it, let me in." Another neighbor heard James Brooks saying, "Put the gun away." Shortly thereafter, five shots were fired. Ora Brooks was shot while running out of the house screaming. Sean Brooks, age eight, and his friend, Scott Miller, were in the Brooks' basement preparing to go to sleep when Turner entered the house. Upon hearing the

gunshots, Sean and Scott ran upstairs. They saw Turner standing in the kitchen. They immediately got down on the floor and covered their heads. Turner's rifle misfired, so he beat them on the head with the butt end of his rifle. When Turner left them to go downstairs, the boys ran from the house. Police arrived several minutes later and arrested Turner at the scene.

2. ¶As a result of the foregoing incident, Turner was charged in district court with three counts of deliberate homicide, two counts of felony assault, and one count of aggravated burglary. Dawson County Public Defender, Jerry Cook (Cook), was appointed to represent Turner. At that time, Cook had 17 years of criminal defense experience. He had handled two homicide cases at the trial level and one negligent homicide case on appeal.

3. ¶Cook has no recorded notes of his meetings with Turner. Cook did not keep time records because he was a salaried public defender. Further, he does not recall exactly when those meetings took place. Cook testified that the seven-year passage of time between his representation of Turner and the evidentiary hearing had much to do with his faulty memory. Cook, however, testified that, in all likelihood, he would have met with Turner prior to his initial appearance in district court on December 16, 1987; at least once prior to arraignment on February 12, 1988; prior to the omnibus hearing on March 1, 1988; and at least once prior to the change of plea hearing on April 12, 1988. In addition, Cook recalled meeting with Turner in the presence of Donald LaPlante several times before sentencing. Based on this testimony, the district court found that Cook maintained personal contact with Turner throughout the course of his representation.

4. ¶Early on in the course of Cook's representation, Turner told Cook that he did not want to put the Brooks family or his own family through a trial. Although Turner denied the truth of this statement at the postconviction hearing, the underlying record in this case contains numerous references to the fact that Turner wanted to avoid a trial for personal reasons. The acknowledgment of waiver of rights and guilty plea form signed by Turner states:

I am entering this plea of guilty voluntarily as my own free act after conferring with my attorney and my mother. It was my instructions to Mr. Cook after our initial interview, that if at all possible, I did not want to put anyone through a trial of this case, especially the Brooks family and my family.

1. ¶Turner also acknowledged at the change of plea hearing that this was a significant

factor underlying his guilty plea. Cook also represented to the court, at the guilty plea hearing, that "after our initial conference, I believe at almost every conference thereafter, [Turner] has requested that I allow him to enter a guilty plea." At the sentencing hearing, Cook mentioned this fact again:

Doug has, from, I believe, the second meeting with me, almost insisted on pleading guilty to the charges. And I think I've told the Court that already. He does have, in his present state of mind, some empathy for the Brooks family and his family. It was never his intention to cause them to feel the hurt a second or third time. He wanted it ended. And I think his entry of a plea of guilty was an effort to do that, however little it was, in view of what happened.

1. ¶In light of this record, the District Court found Turner's testimony not creditable at the postconviction hearing, that he never told Cook he wanted to plead guilty. Rather, it found Cook's testimony creditable that Turner wanted to plead guilty.

2. ¶Despite Turner's desire to resolve the charges without a trial, the District Court found that Cook conducted a factual investigation of the case. Cook did not immediately acquiesce in his course of action. Instead, Cook began to investigate any possible defense which might be used at trial. Cook conducted a factual investigation of the case by reviewing police reports and witness statements, viewing the physical evidence, talking to police officers, and going to the scene of the crime. As a result of his investigation, Cook concluded that the State had a strong factual case against Turner. Cook believed that the evidence would support a conviction of deliberate homicide.

3. ¶Cook considered the possibility of offering a mitigated homicide defense. He identified Turner's age, personal history, and alcohol consumption as mitigating factors to present to the jury, even though intoxication was not a defense under Montana law.

4. ¶Cook testified that he showed Turner the statutes on mitigated deliberate homicide and discussed with him the possibility of pursuing that defense at trial. Cook testified that "we went through all of that on more than one occasion," and that he explained to Turner the elements of mitigated deliberate homicide, "line item by line item." "We talked about using his whole history at trial, and trying to use that as an explanation for what happened, which might get a lesser charge." Cook also explained to Turner that they could use information contained in the mental health evaluation preformed at Warm Springs as evidence in mitigation. Turner told Cook that he was reluctant to have his personal history discussed during a jury trial.

5. ¶Cook testified that he did not file a motion for change of venue, because Turner wanted to plead guilty. Had trial become a possibility, Cook indicated he would have considered such a motion, but acknowledged that it would not have meant Judge Cox was off the case. Contrary to Turner's allegation that Cook failed to interview witnesses he asked him to interview, Cook testified that he did not recall Turner asking him to talk to anyone in preparation for sentencing.

6. ¶On December 16, 1987, Cook filed a motion for a psychiatric evaluation of Turner pursuant to § 46-14-202, MCA (1987), to determine whether, as a result of mental disease or defect, Turner was fit to stand trial. At the March 1, 1988, omnibus hearing, Cook indicated that he was still considering the possibility of relying upon the insanity defense or diminished mental capacity if the case proceeded to trial.

7. ¶Cook recognized the risk of proceeding to trial in hopes of obtaining a conviction on the lesser offense of mitigated deliberate homicide. Cook advised Turner of these risks. Cook told Turner he feared that if the jury convicted him of deliberate homicide, it would send a message to the judge to impose a harsh sentence, even the death penalty.

8. ¶As a result of Cook's motion for a psychiatric evaluation, Turner was sent to Warm Springs State Hospital for 36 days. Following various interviews and testing procedures, Warm Springs personnel compiled a report which was sent to defense counsel, the prosecutor, and the presiding judge. In this report, it was documented that Turner suffered from conduct disorder, solitary aggressive type, alcohol dependence, cannabis abuse, and psychoactive substance abuse. The report further concluded:

Mr. Turner does not suffer from a mental disease or defect that would interfere with his competence to stand trial. He does suffer from Conduct Disorder which is essentially an abnormality manifested by repeated antisocial conduct. . . .

At the time of the alleged crime it is clear that Mr. Turner was under the effects of alcohol intoxication. As with anyone who consumes enough alcohol his impulse control and judgment were severely impaired. Due to the effects of the alcohol and only due to the effects of the alcohol he was not capable of acting with knowledge and purpose at the time of the criminal conduct charged. However, his state was not due to an idiosyncratic response to alcohol. Also, he had foreknowledge of the effects of alcohol, and in spite of two inpatient courses for substance abuse he chose to consume the alcohol with clear knowledge and purpose.

The evaluation also documents that Turner was physically abused as a child, he did not have a good relationship with his adoptive father, and he had been sexually assaulted on one occasion.

1. ¶Cook was informed early on that the prosecutor intended to seek the death penalty if the case went to trial. The prosecutor told Cook that if Turner would plead guilty to the charged offenses, the State would not pursue the death penalty at sentencing. Cook tried to dissuade the prosecutor from treating this as a capital case. He also tried to negotiate a plea upon lesser charges, but to no avail. The prosecutor was firm in his position that Turner would remain charged with three counts of deliberate homicide, two counts of felony assault, and one count of aggravated burglary, and that if the case went to trial, the prosecutor would ask for the death penalty.

2. ¶Cook did not rule out the possibility that the death penalty could be imposed in this case, and he advised Turner of this fact. Judge Cox was a former prosecutor who had recently been elected to the bench, and Cook suspected that he would be a tough sentencing judge. Cook also considered that the death sentence might not be upheld on appeal, and he advised Turner that even if he received the death penalty, it was unlikely that it would ever be carried out.

3. ¶Ultimately, after discussing the alternatives with Cook, Turner made the decision to plead guilty to the charged offenses in exchange for the prosecutor's agreement not to ask for the death penalty. Turner was also motivated to plead guilty by his empathy for the Brooks family and not wanting to further hurt them with a trial. The understanding between the parties was that the prosecutor would ask for something less than the death penalty, and Cook could argue for anything he wanted at sentencing.

4. ¶On April 12, 1988, Turner signed a document entitled "Acknowledgment of Waiver of Rights and Plea of Guilty" in which he acknowledged: (1) the offenses with which he was charged; (2) his right to a trial; (3) the rights he was waiving by pleading guilty; and (4) his satisfaction with the services of his attorney. Turner further acknowledged that he fully understood what he was doing. He also understood that the prosecutor would recommend a sentence totaling 370 years in prison, along with a dangerous offender designation. In support of his guilty plea, Turner acknowledged the following statement of facts:

I am pleading guilty because in fact I know I am guilty. I have had the opportunity to review toxicology reports, reports from the Division of Forensic Science, Affidavit and

Motion for Leave to File Information Direct, as well as having been advised of the facts to be testified to by police officers and eye witnesses. In view of the testimony, as well as all the reports, there is no doubt in my mind that I caused the deaths of James Brooks, Jr., Sharon Brooks, and Ora Brooks, and that I committed the assaults on Sean Brooks and Scott Miller, and that I entered the premises to do so. I have no direct recollection of being in the premises and actually pulling the trigger or striking anyone, but I do have a vague recollection of the arrest, and I recall making a statement to the effect that I killed someone, although I do not recall exactly when that statement was made or why I made it.

I have been advised by Mr. Cook and have received copies of the statutes under which I am charged, as well as the statutes defining mitigated deliberate homicide, and copies of the sentencing statutes. I am entering this plea of guilt voluntarily as my own free act after conferring with my attorney and my mother. It was my instructions to Mr. Cook after our initial interview, that if at all possible, I did not want to put anyone through a trial of this case, especially the Brooks family and my family.

I know and have no doubt that I committed the crimes alleged, even though I cannot understand why, and it is difficult to accept the facts, as I know I have caused a great many people pain and suffering, for which I am truly sorry, knowing that this expression is not enough.

This document was also signed by Turner's mother, Beverly Turner.

1. ¶On April 12, 1988, a change of plea hearing was held. At this hearing, the District Court advised Turner of his constitutional rights and the fact that many of these rights would be waived upon entry of a guilty plea. Turner indicated that he understood. Turner further indicated that he had ample time to discuss the case with his attorney and that he was satisfied with his attorney's services.
2. ¶The sentencing court then placed Turner under oath and questioned him about the voluntariness of his plea. Turner indicated that his plea was entirely voluntary and no threats or promises had been made by the court, the prosecutor, defense counsel, or the sheriff's department. Turner's mother also represented, to the court, that she thought her son's guilty plea was a voluntary choice.
3. ¶Turner acknowledged at the guilty plea hearing that he had discussed possible defenses with Cook. He further acknowledged that he had read the document entitled "Acknowledgment of Waiver of Rights and Plea of Guilty" and that he understood "every word of it." The court questioned Turner about the facts

underlying the offenses and confirmed that, although Turner could not remember certain details about the crimes, Turner himself believed he was responsible for the deaths and the assaults which occurred that night.

4. ¶At the time the decision to plead guilty was made, April 12, 1988, trial was tentatively scheduled for April 20, 1988. Cook acknowledged he was not prepared to go to trial on that date and would have sought to continue the trial had Turner opted to pursue that course of action instead. Cook testified at the evidentiary hearing: "I rarely let anyone enter a guilty plea until I'm satisfied, number one, that that's what they want to do, number two, there is very little defense, or the defense is such that I don't think we can overcome the Prosecution's case, and they are more than likely going to get a verdict."

5. ¶Cook testified that had Turner ever changed his mind about pleading guilty and wanted to go to trial, Cook would have pursued the case to trial. If Turner had not appeared to understand what was involved in a guilty plea, Cook testified he would not have allowed his client to plead guilty. Even Turner acknowledged that Cook never refused to take the case to trial, if that was what Turner wanted to do. The District Court found that Turner's claim that his plea was involuntary came "years after the sentencing hearing" and was "not creditable."

6. ¶On April 19 and 20, 1988, Judge Cox held Turner's sentencing hearing. The State called 14 witnesses, including Turner. The Warm Springs Report was admitted as an exhibit, as well as a social history report prepared by Craig Anderson.

7. ¶Cook's strategy at the sentencing hearing was to ask the court to give Turner some hope for the future. Cook called as a witness LaPlante, who testified extensively about Turner's background. He described how that background contributed to Turner's emotional state on the night of the murders. He opined that Turner was experiencing significant "anniversary dates" which triggered numerous emotional responses. According to LaPlante, Turner knew he was "on the brink" and if he made one error he would be committed to Pine Hills. LaPlante testified that Turner harbored a great deal of anger toward the people who had abused him and had previously entertained thoughts of killing someone. According to LaPlante, Turner rationalized: "I may as well have the best last party that we're gonna have" before going to Pine Hills. LaPlante testified as follows:

That because of the anniversary date syndrome coupled with the disassociation process, all of this triggered within his mind the rehearsal that he engaged in, the thoughts of killing someone; and that he then went about doing it.

1. ¶LaPlante described this as a "psychogenic fugue state," and testified that this diagnosis is not made in the presence of an organic mental disorder. When asked if Turner consciously recognized that he was killing the Brooks family, as opposed to someone else, LaPlante responded:

I do believe that at times during that process Doug did know exactly what he was doing, at a conscious awareness level; that at a subconscious level he was aware of it, his memories of it exist at all times.

But no, I do not believe that he was consciously aware that he was murdering the Brooks.

1. ¶At the close of the evidence, the prosecutor argued that Turner was not capable of rehabilitation as evidenced by his numerous failures despite the services offered to him. He recommended that Turner receive the maximum sentence and be declared parole ineligible, thus guaranteeing that he be permanently removed from society.
2. ¶Cook argued that although Turner received alcohol treatment, he had never received the kind of treatment needed for his underlying problem and, until the underlying problem was addressed, Turner would continue drinking. Cook told the court that he did not offer LaPlante's testimony as an "excuse," but as an insight into Turner's mental processes. Cook acknowledged that the judge had the obligation to protect society, but asked that he give Turner a ray of hope for rehabilitation by not making the "no parole" designation. He also emphasized Turner's age and his willingness to take responsibility for his actions by pleading guilty.
3. ¶Judge Cox imposed a greater sentence than that proposed by the prosecution. Turner was sentenced to a total of 390 years in prison and was designated ineligible for parole. Judge Cox gave the following reasons for his sentence:

1. The Defendant is alone responsible for his behavior even though his background has been less than stable and he may have been a victim of physical and sexual abuse.

2. The Defendant resisted many efforts to help him control his behavior and chemical and alcohol dependency. He was expelled from Hilltop Treatment Center at Havre, Montana, prior to completion of treatment. On the day of his discharge from the Chemical Dependency Center in Glasgow, Montana, he chose to drink again.

3. The Defendant is in relatively good health and is approximately six feet, one inch in height, and weighs 180 pounds. Intellectually he is in the average range, if not slightly above. His MMPI Profile is remarkably normal. He is not psychotic.

4. The Defendant has a considerable record of juvenile criminal activity beginning in May 1985. There are approximately 12 contacts involving offenses ranging from misdemeanors to felony in nature.

5. The crimes committed by the Defendant November 20, 1987, and for which the above Sentences were imposed, were brutal, savage and utterly senseless. There was not motive nor reason for the commission of the crimes. In a matter of minutes, the Defendant killed and destroyed a vivacious, energetic, well respected couple married 22 years, leaving four (4) children to grieve for the rest of their lives. He killed a grandparent of those four (4) children and he brutally assaulted two youngsters age eight and nine who will never forget the nightmare and will probably need counseling for the rest of their lives. The crimes were committed without any provocation by the victims who were unarmed and the crimes were without warning.

6. The Defendant has displayed little remorse and this Court recognizes that may be consistent with [Donald LaPlante's] diagnosis of dissociation.

7. As an aggravating factor, the offenses were committed as a part of a scheme or operation which, if completed, would result in the death of more than one person and in fact resulted in three (3) deaths. The evidence is not clear but for the fact that the rifle had not malfunctioned, the two youths who were victims of the felonious assaults might have also been killed.

8. The only statutory mitigating circumstance is that the Defendant was less than 18 years of age when he committed the crimes. The Court does not believe that the voluntary

intoxication of the Defendant under the circumstances of this case is a mitigating factor. The evidence clearly disclosed that the Defendant was aware of the effects of alcohol since at least age 12; that he had twice received in-patient treatment for alcoholism; but instead of using his will, the Defendant actually fostered it seeming to actually enjoy being an alcoholic as well as using other drugs because it was "fun to drink." On the night of the crimes the Defendant deliberately partied and drank excessively and made the determination and calculated decision to become intoxicated. The crimes were committed approximately one (1) week after the Defendant's discharge from in-patient treatment and the Defendant himself admitted that during the last week of his treatment he in fact planned to continue drinking upon his discharge.

9. Because of the nature of the crimes committed, the manner in which they were committed and the Defendant's history of criminal activity, with continued repetition of crimes, continued use of alcohol, and continued rejection of helpful intervention, any chance of rehabilitating the Defendant is poor, if not impossible.

10. When crimes such as the above have been committed in such a brutal, savage and senseless manner, then the only response that a civilized society can make is to remove the perpetrator of those crimes from society, not out of society's revenge or retribution, but out of the real fear that if this is not done then the perpetrator will continue to commit additional violent crimes and the general public is at risk.

1. ¶In May 1993, Turner filed a postconviction relief petition requesting to withdraw his guilty pleas. Turner alleged 13 claims in his petition, the majority of which were allegations of ineffective assistance by Cook. A hearing was held on these claims in January 1995, before District Judge Ted Mizner. Several witnesses testified at this hearing.
2. ¶LaPlante's testimony at the postconviction hearing did not vary much from his testimony at the sentencing hearing. He described how Turner was in and out of a dissociative state the night of the murders, and what might have caused that state. LaPlante testified that a person in a dissociative state nonetheless has the capacity to act purposely or knowingly, which is the mental state requirement for deliberate homicide.
3. ¶LaPlante testified that he was present during several meetings between Turner and

Cook where Cook explained to Turner the charges against him and the evidence in the State's possession. LaPlante heard Cook talk about the legal options available to Turner. During those conversations, LaPlante testified that Turner was oriented to time and place and appeared to understand what was going on. LaPlante stated: "He appeared, a number of times, not to care." LaPlante further testified that Turner was often unwilling to provide information. He recalled asking Turner: "[H]ow can you help us, how can we help you if you won't give us the information?"

4. ¶In support of his claim that Cook did not adequately investigate or present mitigating evidence at sentencing, Turner called his mother, Beverly, and his grandmother, Effie Wehren. Mrs. Wehren adopted Turner when he was three and one-half years old. She testified that when Turner first came to live with her, he had frequent nightmares. While in the care of his mother, Mrs. Wehren recalled seeing black and blue marks on his head. He was often left with a babysitter who placed him in an ice bath when he messed his pants. Turner's little brother had running sores on his bottom.

5. ¶Mrs. Wehren also testified that Turner and his brother hated their mother's boyfriend, Jim Sparks. Mrs. Wehren was not aware of any physical abuse, but believed that Sparks was unfair because he made the boys work all the time and he belittled them.

6. ¶Mrs. Turner testified that she recalled Cook discussing with her and Turner the nature of the charges, the possibility of a mitigated deliberate homicide defense, and the death penalty as a possible punishment. Mrs. Turner testified that she had concerns about Cook's representation of her son, although she was unable to articulate any specifics.

7. ¶Turner also called Michael Donahoe as an expert witness. Donahoe testified that Cook's representation was substandard because (1) he did not follow the procedure outlined in Ake v. Oklahoma for obtaining a mental health evaluation and review of that evaluation; (2) he did not challenge the transfer of the case to district court; (3) he did not do enough to "get the death penalty off the table;" (4) he failed to anticipate or object to the prosecution's evidence at sentencing; and (5) he did not advise Turner of his right to remain silent prior to the Warm Springs evaluation. Donahoe did not offer any testimony about how Turner was prejudiced by these alleged errors. On cross-examination, Donahoe admitted that, although he may have tried the case differently, he was not proposing that he could have achieved a different result.

8. ¶Affidavit testimony was also offered from three out-of-state attorneys. The District Court gave these affidavits and the testimony of Donahoe little weight, concluding

that the evidence did nothing more than demonstrate how different attorneys might handle a case in different ways.

9. ¶Turner disputed Cook's testimony that he wanted to plead guilty "from the start." In light of the entire record, however, the District Court found this testimony incredible. Turner described how Cook explained his options prior to entry of his guilty pleas as follows:

It was his position that there was one way we could approach it, by going to trial and trying to get a mitigated deliberate homicide verdict, but he didn't think the chances of that were very good, and if the Jury came back with the guilty verdict on deliberate homicide, it would send a message to Judge Cox, who is, you know, a member of the Glendive community, that this is what's expected of him, is to give me the death penalty.

1. ¶Turner indicated that his general dissatisfaction with Cook's representation arose after he was sentenced, upon arriving at Montana State Prison. Turner testified that after he had a chance to "look back and think about some things," he came to the conclusion that Cook had "sent [him] up the river."

2. ¶Following the postconviction evidentiary hearing, Turner moved to expand the record to include notes made by a social worker for the Department of Family Services to the effect that "Jerry [Cook] said he'll have Doug [Turner] plead guilty so as to avoid the death penalty." Turner proposed that this evidence was newly discovered and was important to resolve a conflict in testimony between Turner and Cook. Turner also requested the opportunity to conduct further discovery in this regard.

3. ¶The District Court granted Turner's request to take the deposition testimony of the social worker, Robert Nasheim. Thereafter, Turner moved to supplement the record with the Nasheim deposition and other documents. The State did not oppose this request, but argued that the supplemental material did not sufficiently tip the evidentiary scale in Turner's favor to warrant the granting of postconviction relief. The District Court did not rule on the motion before issuing its findings of fact, conclusion of law and order on July 28, 1998, denying postconviction relief. Thereafter, Turner moved the District Court to reconsider its ruling pursuant to Rule 60(b), M.R.Civ.P. The District Court declined to do so.

## STANDARD OF REVIEW

1. ¶Turner argues that we should utilize plenary review for ineffective assistance of

counsel cases. He argues that under the appropriate standard, this Court should apply a more deferential standard of review with respect to the District Court's determination of the underlying "historical facts." The ultimate question of whether those facts satisfy the relevant ineffective assistance standard is a mixed question of fact and law, which is subject to independent appellate review. Turner bases this argument on Strictland v. Washington (1984), 466 U.S. 668, 698, and numerous other federal cases.

2. ¶The State concedes that we apply a plenary standard when reviewing questions of constitutional law. It, however, argues that ineffective assistance of counsel claims are not subject to plenary review. Rather, the inquiry is whether the District Court's findings are supported by substantial evidence and whether the court correctly applied the appropriate legal standard to the claim. This inquiry accords deference to a district court's prior review of the claim and does not mandate full-blown plenary review. The State relies on Bone v. State (1997), 284 Mont. 293, 302, 944 P.2d 734, 740, to support this argument.

3. ¶We have yet to squarely address this issue. This issue was raised, however, in Hans v. State (1997), 283 Mont. 379, 391, 942 P.2d 674, 681. That case did not arise out of a denial of a postconviction relief petition. Rather, we had ordered the district court to conduct an evidentiary hearing and issue findings of fact and conclusions of law. Therefore, we concluded that we were not reviewing a petition for postconviction relief. We did state that "[t]he general standards for the establishment of a claim of ineffective assistance of counsel were established in the United States Supreme Court case of *Strickland*." *Hans*, 283 Mont. at 391, 942 P.2d at 681. We have continued to look to *Strickland* for the appropriate standard of review. *Bone*, 284 Mont. at 303, 944 P.2d at 740 ("We review claims of ineffective assistance of counsel under the standards set forth in *Strickland*"); Hagen v. State, 1999 MT 8, ¶ 10, 293 Mont. 60, ¶ 10, 973 P.2d 233, ¶ 10 ("Montana courts apply the two-pronged test set forth by the United States Supreme Court in *Strickland*"); State v. Berg, 1999 MT 282, ¶ 28, 991 P.2d 428, ¶ 28 ("We review claims of ineffective assistant of counsel pursuant to the two-prong test set forth in *Strickland*").

4. ¶We review a district court's denial of a postconviction relief petition to determine whether the district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *Bone*, 284 Mont. at 302, 944 P.2d at 739-40. Claims of ineffective assistance of counsel, however, are mixed questions of law and fact. *Strictland*, 466 U.S. at 698 ("both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact"). Therefore, our review is de novo. Iaea v. Sunn (9th Cir. 1986) 800 F.2d 861, 864 ("The effectiveness of

counsel is a mixed question of law and fact, reviewed de novo."); Langford v. Day (9th Cir. 1996), 110 F.3d 1380, 1386 ("Langford's challenge to his guilty plea is based on his claim of ineffective assistance of counsel. We review that issue de novo."); *see also, Strickland*, 466 U.S. at 698.

## DISCUSSION

1. ¶Should Turner be allowed to withdraw his guilty pleas because they were involuntary based on ineffective assistance of counsel?

2. ¶Turner argues that Cook failed to conduct an adequate and appropriate investigation of the facts and Turner's mental state. This inadequate investigation, in turn, led to Cook providing misleading, incomplete and inaccurate advice to Turner regarding his plea and potential sentences. Turner's guilty pleas were not knowingly, intelligently and voluntarily entered. He did not waive his claims, and his request to withdraw his pleas was timely.

3. ¶The State counters that the object of an ineffectiveness claim is not to grade counsel's performance. The object is to determine whether counsel's conduct so undermined the proper functioning of the adversarial process that the result of the proceeding is unreliable. Despite Turner's insistence that Cook's performance fell short in nearly all respects, Turner has not demonstrated how any other result would have accrued had counsel not committed the "errors" he allegedly committed, or why this case should now be tried before a jury, more than ten years after Turner voluntarily admitted his guilt.

4. ¶The State argues that Turner's decision to plead guilty was based on competent advice from counsel, as well as Turner's personal desire to avoid a trial. The record is replete with evidence of Turner's motivations, and Cook displayed his competence by honoring his client's wishes after fully discussing the risks and possible outcomes of proceeding to trial. In light of the evidence, no competent lawyer could assure Turner that a jury would not convict him of the charged offenses, or that the judge would not impose the death penalty had those convictions been obtained. Turner has merely shown a myriad of ways that the case could have been handled differently, a showing which does not equate with ineffectiveness.

5. ¶A voluntary plea is one that is made with knowledge of fundamental constitutional rights and an understanding of the nature of the crimes charged. North Carolina v. Alford (1970), 400 U.S. 25, 31; *see also*, § 46-12-210, MCA (1987). "[A] plea is not involuntary simply because it was entered to avoid a greater punishment." State v. Milinovich (1994), 269 Mont. 68, 71, 887 P.2d 214, 216. "The fundamental purpose

of allowing a defendant to withdraw a guilty plea is to prevent the possibility of convicting an innocent man." State v. Miller (1991), 248 Mont. 194, 197, 810 P.2d 308, 310. A defendant is authorized to withdraw his guilty plea for good cause shown. Section 46-16-105(2), MCA (1987). The "good cause" requirement is satisfied if a petitioner can show that counsel was ineffective. State v. Senn (1990), 244 Mont. 56, 59, 795 P.2d 973, 975.

6. ¶In evaluating challenges to a guilty plea based on ineffective assistance of counsel, we look to the *Strickland* two-part test. State v. Boyer (1985), 215 Mont. 143, 147, 695 P.2d 829, 831 (adopting the *Strickland* test in Montana); Hill v. Lockhart (1985), 474 U.S. 52, 58 (*Strickland* test applies to challenges to guilty pleas). Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. *Strickland*, 466 U.S. at 687.

7. ¶First, the defendant must show that counsel's performance was deficient in that counsel failed to act within the range of competence demanded of attorneys in criminal cases. State v. Gonzales (1996), 278 Mont. 525, 532, 926 P.2d 705, 710. When applying the *Strickland* standards, we will not second-guess trial tactics and strategy. *Gonzales*, 278 Mont. at 533, 926 P.2d at 710. We indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. *Strickland* recognizes that "there are countless ways to provide effective assistance in any given case," and "even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. The purpose of the effective assistance of counsel guarantee is to simply ensure that the criminal defendant receives a fair trial. It is not to improve the quality of legal representation. *Strickland*, 466 U.S. at 689.

8. ¶Turner makes several claims that Cook's representation was deficient. First Turner argues that Cook failed to adequately investigate various defense options. Turner takes issue with the amount of research Cook did. Turner asserts that had Cook better researched the death penalty he would have concluded that even if Turner received the death penalty it would have been over turned on appeal. Turner cites Kennedy v. Maggio (5th Cir. 1984), 725 F.2d 269, for the proposition that this constitutes ineffective assistance of counsel.

9. ¶This case is not analogous to *Kennedy*. Kennedy was indicted in 1972 for aggravated rape, which was a capital offense under Louisiana law. As a result of the Supreme Court's decision in Furman v. Georgia (1972), 408 U.S. 238, Louisiana's entire capital punishment scheme was rendered invalid and the death penalty was

"non-existent" for Kennedy. The Fifth Circuit concluded that counsel had given "patently erroneous advice" to Kennedy when he advised otherwise, despite the intervening *Furman* decision. *Kennedy*, 725 F.2d at 272. Because Kennedy "testified repeatedly" that he pleaded guilty "to avoid the possible imposition of the death penalty," the court concluded that his resulting plea was involuntary. *Kennedy*, 725 F.2d at 270.

10. ¶The case presently before this Court is distinct. As Judge Mizner correctly found, the death penalty was legally available to the prosecution. Whether it would have been upheld on appeal is inconsequential. The fact that it was available and the prosecution intended to seek it obligated Cook to advise his client of these facts. Further, the defendant in *Kennedy* had a credible argument that he plead guilty based solely on his unfounded fear of the death penalty. Here, the record is replete with statements by Turner that he was pleading guilty to avoid a trial for personal reasons, not because he feared the death penalty. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. Cook's representation was not ineffective on this point.

11. ¶Second, Turner claims Cook's representation was deficient because of the way he handled Turner's mental evaluation. Turner claims that Cook should have utilized the established *ex parte* procedure for obtaining a defense evaluation. Cook erred in failing to object to the scope of the court's order. Cook rendered ineffective assistance in stipulating to the appointment of a psychologist to interview Turner and to work for each of the adversaries as well as the court. Cook instead chose a course of conduct that greatly limited his future options and which foreshadowed a result in which the accused plead to the most serious possible crime with an open-ended agreement.

12. ¶The District Court rejected this argument. The District Court noted that Cook followed the statutory procedure outlined in § 46-14-202, MCA (1987), which meant that the result of the evaluation would be distributed to the prosecutor and the court. The District Court determined that prior to the Ninth Circuit's decision in Smith v. McCormick (9th Cir. 1990), 914 F.2d 1153, it was standard practice in Montana for defense attorneys to employ the statutory procedure, as opposed to the procedure outlined in Ake v. Oklahoma (1985), 470 U.S. 68. This is in direct contrast to Turner's assertion that Cook should have utilized the established *ex parte* procedure (from *Ake*) for obtaining a defense evaluation. Turner cites no factual or legal basis for this proposition. Indeed, there is none.

13. ¶Turner overlooks that we have already resolved this issue in *Hans*, 283 Mont. at

379, 942 P.2d at 674. In *Hans*, we rejected any notion that counsel is ineffective for following Montana's statutory procedure, as opposed to the *Ake* procedure, to obtain a mental health evaluation prior to the Ninth Circuit's decision in *Smith v. McCormick, supra*:

Hans' counsel . . . did not have the benefit of *Smith* when acquiescing in the dissemination of the mental health report. As the United States Supreme Court warns of the danger in applying hindsight to assess attorney performance in *Strickland* . . . it follows that subsequently decided case law cannot be used to judge an attorney's conduct at the time of representation. Furthermore, we have held that counsel is not ineffective for following a statute in effect at the time. (citation omitted) Therefore, we hold that defense counsel's acquiescence in dissemination of the mental health reports pursuant to § 46-14-202, MCA, is not grounds for a finding of ineffective assistance of counsel.

*Hans, 283 Mont. at 402, 942 P.2d at 688. Cook was not ineffective for failing to follow the Ake procedure when requesting a mental health evaluation.*

1. ¶Third, Turner claims that Cook failed to adequately inform him of his constitutional right against self-incrimination before Turner received his mental health evaluation. Turner argues that Cook's statement to "tell all" without first ascertaining either what "all" would be, or that Turner absolutely did not know anything, was not the product of a tactical decision. Cook was ineffective in advising Turner to cooperate with the state psychologist examining him.

2. ¶The District Judge, however, found that this was a tactical decision which the court would not second-guess. Further, the District Court concluded that Tuner suffered no prejudice as a result of Cook's tactics. The Warm Springs report was used by Turner at sentencing. There is no evidence that the State utilized any information in the report for any purpose. It was Turner who used this information to his advantage during sentencing. Even if we assume that this was not a tactical decision, Turner has failed to show how this prejudiced his defense. Even if Turner had been advised on his right to remain silent, there is no indication that he would have refused to plead guilty. We agree with the District Court that this does not establish that Cook's representation was ineffective.

3. ¶Lastly, Turner alleges an array of reasons why Cook's representation was ineffective. Turner utilizes several expert witnesses in an attempt to lend credit to his argument. The District Court rejected this line of argument as merely an example of how different attorneys will try the same case differently. We agree.

4. ¶We have repeatedly observed that "[c]laimed inadequacy of counsel must not be tested by a greater sophistication of appellate counsel, nor by that counsel's unrivaled opportunity to study the record at leisure and cite different tactics of perhaps doubtful efficacy." State v. Langford (1991), 248 Mont. 420, 433, 813 P.2d 936, 946 (citations omitted); *see also*, State v. Hall (1983), 203 Mont. 528, 539, 662 P.2d 1306, 1311. In State v. Lopez (1980), 185 Mont. 187, 191, 605 P.2d 178, 180-81, we cautioned: "the fact that some other lawyer . . . would have done differently . . . is not ground for branding the appointed attorney with the opprobrium of ineffectiveness, or infidelity, or incompetency" (citation omitted). Judicial scrutiny of counsel's performance must be "highly deferential," and "every effort be made to eliminate the distorting effects of hindsight to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Langford*, 248 Mont. at 433, 813 P.2d at 946 (quoting *Strickland*, 466 U.S. at 689). Affidavits of Turner's experts constitute nothing more than mere second-guessing of Cook's strategy.

5. ¶Under the second prong of the *Strickland* standard, the defendant must show that the deficient performance prejudiced the defense. The defendant must show a reasonable probability exists that, but for counsel's errors, he would not have pleaded guilty but insisted on going to trial. *Hill*, 474 U.S. at 59. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Both prongs must be met to establish an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 687.

6. ¶Turner fails to directly address this prong of the *Strickland* standard. Instead, Turner argues he should be allowed to withdraw his guilty pleas because the errors under prong one render them involuntary. That if Turner's case had been handled differently, he would have insisted on trial. This is contradictory to the record.

7. ¶From early on in the course of Cook's representation, Turner informed Cook of his desire not to go to trial. Turner did not want to put his family nor the remaining Brooks family through a trial. Although Turner now denies this, the underlying record supports its truth. Turner signed an acknowledgment of waiver of rights and guilty plea containing language that he did not want to put his family or the remaining Brooks family through a trial. Further, both Turner's testimony and Cook's representations at the sentencing hearing support that Turner was pleading guilty to avoid further hurting the parties involved. This was the primary motivation behind Turner's guilty plea.

8. ¶Furthermore, at the change of plea hearing, Turner was thoroughly advised of his rights and he appears to have understood what rights would be waived if he chose to

plead guilty. The people who had close contact with Turner during this process, including Cook, Turner's mother, and Donald LaPlante, similarly observed that Turner knew exactly what he was doing and understood the consequences of his actions. The District Court concluded that Turner's guilty plea was the product of a voluntary and intelligent choice among the alternative courses of action open to the defendant. We agree.

9. ¶Nothing Turner alleges Cook should have done would have altered the outcome of this case. Turner voluntarily pled guilty after being fully advised of his options. The District Court properly rejected Turner's claim that Cook was ineffective and that he should be allowed to withdraw his pleas.

10. ¶The order denying postconviction relief is affirmed.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER