No. 03-360

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 215

LUKE SORAICH,

        Petitioner and Appellant,

    v.

STATE OF MONTANA,

        Respondent and Respondent.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, Cause No. DC 96-065,
The Honorable Gregory R. Todd, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Chad Wright, Montana Appellate Defender Office, Helena, Montana

            William Hooks, Attorney at Law, Helena, Montana

        For Respondent:

            Hon. Mike McGrath, Attorney General; C. Mark Fowler,
Assistant Attorney General, Helena, Montana

            Dennis Paxinos, Yellowstone County Attorney; Kevin R. Peterson, Deputy
County Attorney, Billings, Montana

Submitted on Briefs: January 6, 2004

Decided: August 17, 2004

Filed:

_____
Clerk

Justice John Warner delivered the Opinion of the Court.

¶1      Luke Soraich appeals from the Order of the Thirteenth Judicial District Court, Yellowstone County, denying his petition for postconviction relief.

¶2      The issue before the Court is whether the allegedly ineffective assistance of Soraich's counsel prejudiced his defense to the extent that a new trial is required.

¶3      We affirm.

¶4      The facts of the underlying case are set forth in detail in *State v. Soraich*, 1999 MT 87, ¶¶ 3-13, 294 Mont. 175, ¶¶ 3-13, 979 P.2d 206, ¶¶ 3-13, (*Soraich I)*.  Soraich was charged with deliberate homicide for the shooting death of one Dane Jensen.  His defense was that he did not do it; that someone else did.  Soraich was convicted.  He appealed the denial of his motions for mistrial and this Court affirmed.  *Soraich I*, ¶ 27.

¶5      Soraich then petitioned for postconviction relief, claiming that his court-appointed attorney, Vern Woodward, was ineffective.  The District Court denied Soraich's petition, he appealed, and this Court remanded for an evidentiary hearing because the trial record was devoid of evidence of Woodward's pretrial tactical decisions, prohibiting Soraich from raising the ineffective assistance claims on direct appeal.  *Soraich v. State*, 2002 MT 187, ¶ 25, 311 Mont. 90, ¶ 25, 53 P.3d 878, ¶ 25, (*Soraich II)*.

¶6      On remand, the District Court again denied relief.  This time the court focused on the second prong of the *Strickland* test, which asks whether the Defendant was prejudiced by the allegedly deficient performance of his counsel.  *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693; *State v. Harris*, 2001 MT 231, ¶ 19, 306 Mont. 525, ¶ 19, 36 P.3d 372, ¶ 19.

2

¶7     The allegation of deficient performance at trial revolves around statements Woodward made in his opening statement. Specifically, Woodward informed the jury that one of the State of Montana's key witnesses, Deuce Driver, had made numerous conflicting statements about his location in Jensen's home on the night of the shooting. Woodward told the jury that Deuce was interviewed four times. The first time Deuce told the police he was right behind the victim, Jensen, when the shot was fired, and that he was pretty sure Soraich had a gun. The second time Deuce told the police he was following Jensen to the bedroom and that he was sure Soraich had a gun. The third interview was with Scott Farmer, an investigator for the public defender, and Deuce told Farmer that he was sitting on the couch when Soraich shot Jensen. The fourth interview was with Woodward himself and Deuce told Woodward that he was walking toward the living room, not the bedroom, and only heard a gunshot.

¶8     Woodward told the jury a number of other things about Deuce: that Deuce and Soraich were friends; that Deuce and Soraich drank and did drugs together; that Deuce was agitated after the murder while Soraich was calm; that Deuce admitted wearing gloves the night of the murder, but when asked to produce them gave the police a pair of women's Isotoners; that another witness, Big Tom Meurat, was lying to protect Deuce; that the police botched the investigation in not having Deuce's clothes tested at the lab until eleven months after the crime was committed; and that Deuce changed his story about what Soraich allegedly did with the gun after the murder. In essence, preparing for a defense that Soraich did not commit the murder, Woodward attempted to set the scene that someone else, probably Deuce, killed Mr. Jensen.

¶9 Over the course of a five-day trial, the State introduced evidence pointing to Soraich as the killer. A forensic expert testified that she found gunshot residue on Soraich's coat sleeves. Big Tom Meurat, who claimed to be friends with both Deuce and Soraich and who was waiting outside Jensen's apartment for them, testified that Soraich came out of Jensen's apartment with blood on his nose. Meurat testified that Soraich said "I just killed Dane" and that if Meurat told anyone, Soraich would hurt him or his family. Deuce Driver, the only eyewitness to the murder, testified that he rode around with Soraich after the killing because he was afraid of upsetting Soraich but, after awhile, asked Soraich to take him home. When Deuce asked to go home Soraich said, "What are you going to do, take me down? Are you going to turn me in?" Deuce testified that when Soraich finally took him home, Deuce told his mother what happened and she called the police.

¶10 Prior to trial, Woodward disclosed to the State that he planned on calling the investigator, Farmer, to impeach Deuce's testimony if necessary. Throughout the course of the proceedings, Woodward was aware that Farmer had submitted a two-page memorandum to Woodward's predecessor. However, Woodward had not disclosed the memo to the State for two reasons. First, he erroneously believed that his predecessor would have already redacted the memo as necessary and disclosed it. Secondly, he believed it was privileged.

¶11 During the State's case in chief, while cross-examining Deuce, Woodward went over Deuce's conflicting statements about his location in Jensen's apartment at the time of the shooting: two given to a detective about nine days apart; one to the investigator, Farmer; one to Terrell Moore; and Deuce's testimony on direct examination. Woodward highlighted several inconsistencies in Deuce's testimony. Evasive, "I don't recall," type responses were

4

the bulk of Deuce's answers to this line of questioning.  With respect to Farmer, the following took place:

> Woodward: Now, you recall talking to Scott Farmer, don't you?
> Deuce: Refresh my memory who that is.
> Woodward: He's an investigator who was working for the defense some time ago.
> Deuce: Okay, yeah.
> Woodward: You recall talking to him, don't you?
> Deuce: Yes . . . .
> Woodward: Okay.  Now, it's true, isn't it, that you told Mr. Farmer that you were seated on Dane's couch when the shot was fired?
> Deuce: That's not true.
> Woodward: You didn't say that?
> Deuce: I didn't say that . . . .
> Woodward: Now, is it your testimony that you did not tell Scott Farmer that you were seated on the couch when this happened?
> Deuce: Yes, it is.
> Woodward: Can you think of any reason why he might say otherwise?
> Deuce: No, I can't.

¶12　At the beginning of the Defendant's case in chief, the State moved to have Farmer's testimony excluded entirely.  The court denied that motion.  The State then moved to compel Woodward to disclose Farmer's memo.  Though the record does not contain the court's ruling, Woodward testified at the hearing on the petition for postconviction relief that the court ruled if Woodward used the memo, it had to be disclosed to the State in its entirety.  At that point Woodward made the decision that he would not call Farmer because he did not want the State to have access to those parts of the memo containing Farmer's opinions.  He decided that full disclosure would be more damaging than simply not calling Farmer to the stand.  Woodward testified at the postconviction hearing that he believed he had already adequately impeached Deuce.

¶13　Soraich now alleges that this sequence of events prejudiced his case to the extent that

5

the result would have been different if Farmer had testified. Soraich claims that defense counsel was ineffective because in his opening statement at trial Woodward described to the jury several statements made by Driver. Counsel pointed out that Driver gave inconsistent statements, one of which was to the investigator, Scott Farmer. Soraich claims counsel left the jury with the impression that Farmer would testify, without first determining whether he would be able to put Farmer on the stand to give evidence of Driver's inconsistency. He argues that counsel's failure to support his opening statement opened the door for the State to attack Soraich's failure to prove his defense in its final argument. Thus, he was prejudiced.

¶14 As claims of ineffective assistance of counsel are mixed questions of law and fact we review a claim of ineffective assistance of counsel de novo. *State v. Turner*, 2000 MT 270, ¶ 47, 302 Mont. 69, ¶ 47, 12 P.3d 934, ¶ 47.

¶15 The issue is whether counsel's performance prejudiced Soraich's defense to the extent that a new trial is required.

¶16 We have adopted the two-pronged *Strickland* test in deciding ineffective assistance of counsel claims in criminal cases. *Soraich II*, ¶ 14. The test requires petitioner show that 1) counsel's performance was deficient, and 2) that the deficiency prejudiced the defense. *Soraich II*, ¶ 15. To satisfy the second prong of the test, the defendant must demonstrate a reasonable probability that the proceeding would have turned out differently had it not been for counsel's errors. A reasonable probability is one sufficient to undermine confidence in the outcome. *Soraich II*, ¶ 15.

¶17 We need not specifically evaluate Woodward's alleged error if it could not be said

6

to prejudice the defendant to the degree that the outcome of the trial is implicated. *Soraich II*, ¶ 15. What matters is whether considering the totality of the evidence, there was a reasonable probability that the outcome of the trial would have been different absent counsel's deficient performance. *Soraich II*, ¶ 15.

¶18 The defense theory was that Soraich did not shoot the victim and that Deuce was the real killer. On the whole, Woodward did a respectable job with the defense, given that he had to overcome physical evidence, eyewitness testimony, expert testimony, and Soraich's own convoluted statement to the police. He tried to meet what he considered each of the weaknesses in the State's case with contrary arguments and presented the jury with considerable fodder for deliberation.

¶19 The decision of counsel not to call a witness to impeach a State's witness to show that such witness told inconsistent stories, when that point had already been established through another witness, Terrell Moore, as well as cross-examination concerning all of the inconsistencies, cannot under these circumstances be said to have created a reasonable probability that the result of the trial would have been different absent the failure to call such witness. As stated by the District Court, "the statement in the Defendant's opening regarding presentation of evidence to dismantle Deuce's credibility, was presented through other testimony and cross-examination." Farmer's testimony "would have just added another instance of inconsistent statements by Deuce."

¶20 At trial, the State presented ample evidence to implicate Soraich as Jensen's killer. At the postconviction hearing, Soraich did not produce any evidence, other than that the State was able to mention in its closing that Woodward failed to call Farmer, to the effect

that Woodward's performance caused him any prejudice. We hold that this single factor in a complex trial that lasted five days does not demonstrate a reasonable probability that the outcome of the trial would have been different absent the alleged error by counsel. The District Court did not err in dismissing Soraich's petition for postconviction relief.

¶21 Affirmed.

/S/ JOHN WARNER

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA O. COTTER
/S/ JIM REGNIER
/S/ JIM RICE